UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
                                                           :
PAUL VICINO,                                               :
                              Plaintiff,                   :    **MEMORANDUM DECISION AND**
                                                           :    **ORDER**
                - against -                                :
                                                           :    17-cv-4485 (BMC)
NANCY A. BERRYHILL, Acting                                 :
Commissioner of Social Security,                           :
                                                           :
                              Defendant.                   :
                                                           :
---------------------------------------------------------- X

**COGAN**, District Judge.

   1.   Plaintiff seeks review of the determination by the Commissioner of Social Security, following a hearing before an Administrative Law Judge, that he is not disabled for purposes of receiving disability insurance benefits under the Social Security Act. Plaintiff has severe impairments of major depression, anxiety, personality disorder, ADHD, and migraines. The ALJ nevertheless found that plaintiff has sufficient residual functional capacity to perform a full range of work at all exertional levels, with the limitations that he could only work in a low stress environment doing simple and repetitive tasks.

   2.   The only point that plaintiff raises which has potential merit (and plaintiff barely raises it at that) is the misapplication of the treating physician rule. The ALJ gave "little weight" to the opinions of Dr. Etka Patel, plaintiff's treating psychiatrist, because she opined that plaintiff had marked or extreme limitations, which the ALJ thought were inconsistent with her treatment notes.

   3.   Dr. Patel's opinions certainly bear all the indicia of coming from a reliable treating physician. Her medical specialty, psychiatry, is the one directed at plaintiff's

impairments. She has a solid longitudinal relationship with plaintiff, having conducted more than fifty sessions on a weekly basis with him; one must conclude that she knows his mental condition quite well. She prepared extensive notes for each session, each of which must average about five pages, and although a substantial portion of each note carries forward from a prior note, it is clear that she added new, significant input in virtually every one. She conferred with other psychiatrists who had treated plaintiff both before and after her relationship with him.

4. Moreover, this wasn't a prearranged relationship brokered by a claimant's attorney. Rather, plaintiff had what used to be called a nervous breakdown; he voluntarily committed himself to a psychiatric facility because of the risk of suicide after showing up at an emergency room, and upon his discharge 9 days later, he was assigned for weekly psychiatric therapy to Dr. Patel at the same hospital. She therefore had access to the extensive admission and discharge notes that led to him being placed in her care. Indeed, one of the manifestations of the concern that brought him to the emergency room and psychiatric inpatient facility – suicidal ideation – remained in play throughout his treatment with Dr. Patel. Although Dr. Patel ultimately took the view that he was not a high suicide risk (sometimes moderate, sometimes slight), that risk was something to which she paid a lot of attention, especially in light of his family history of suicide and his wife's statements that he had made past attempts.

5. In addition, Dr. Patel's opinion was not only contained in the usual, often partially completed, check-the-box-form for a medical source statement. Although she completed such a form shortly after plaintiff filed his disability application, she did not leave the narrative sections blank, as sometimes is the case. In opining, for example, that plaintiff has "marked" limitations in understanding and remembering simple instructions, carrying them out, and making simple

work related decisions; and "extreme" limitations as to those domains when their demands are complex, she explained the "factors … that support[ed her] assessment":

> Patient has a long standing history of ADHD and dyslexia in which he has been in treatment for >20 years. In addition, patient has a history of anhedonic depression which required inpatient hospitalization in a psychiatric facility where patient received acute and maintained ECT [electroconvulsive therapy] treatment. Patient has suffered from cognitive impairment secondary to the ECT which has slowed down his processing speech attention and concentration. Given patient's poor baseline of writing and verbal knowledge skills, this has further deteriorated his functioning.

The other check-box sections of the form are each followed by similarly detailed explanations of the basis for the opinions expressed above them.

6. Each statement in her narrative insertions to the form are solidly based on the record. For example, with regard to the above-quoted passage, the record shows that: (1) plaintiff had been in treatment since the age of 15 for ADHD, dyslexia, and depression; (2) Dr. Patel's consistent diagnosis in her notes was "major depressive disorder[,] recurrent episode"; "adult ADHD attention deficit hyperactivity disorder;" and "borderline personality disorder"; (3) plaintiff was committed, in fact, as noted above, to a psychiatric facility within his claimed period of disability; (4) virtually all of Dr. Patel's treatment notes support the conclusion of anhedonic depression – the notes portray a person with a nearly complete absence of joy; (5) surprisingly, plaintiff received extensive amounts electro shock therapy– two or three times per week extending over a period of months; and (6) Dr. Patel's notes are replete with references to the deleterious effect that the shock therapy, which is known to cause both cognitive impairment and memory loss, see e.g. S.M. McClintock, J. Choi, Z.D. Deng, L.G. Applebaum, A.D. Krysal, S.H. Lisanby, Multifactorial Determinants of the Neurocognitive Effects of Electronconvulsive Therapy, 30 Journal of Electroconvulsive Therapy 165-76 (2014), had on plaintiff's memory. The Commissioner cannot dispute any of these observations.

7. But that is not all. In addition to the SSA form template that Dr. Patel completed, she composed an even more detailed letter summarizing his psychiatric history, her diagnosis, and his then-current (about one month prior to his hearing before the ALJ) status. Some of her statements in this letter go to his functional capacity:

> Paul received a course of acute ECT while inpatient and a second course of ECT while being treated as an outpatient, with some maintenance ECT for relapse in depressive symptoms. Patient's last ECT treatment was on 2/18/16 [about one year before his ALJ hearing], and ECT treatment was discontinued due to cognitive impairment side effects. Paul had been having difficulty with processing speed and recent/remote memory, which effects have transpired until now. There are rare circumstances when the cognitive impairment is deemed more long term, which is what Paul is experiencing as he continues to have remote memory difficulties as well as difficulties with processing speed, attention and task sustainability. …
>
> Paul is currently unable to function at his baseline with decline in grooming/hygiene/ADLs, unable to re-engage in work (was formerly a chef), and who's house is currently going into foreclosure. Patient has attempted to work as a chef consultant however due to his depression and residual cognitive impairments, has not been able to perform up-to-par. …
>
> Based on my work with Paul Vicino, he has limited sustained concentration/processing speed and persistence due to ongoing depression, ruminations, and apathy. Patient has not been engaging in social interactions and has been isolated and detached.

8. Other statements in this letter tend to flesh out more general observations in the treatment notes. For example, the treatment notes refer to statements from plaintiff's wife in which she alludes to prior suicide attempts, but there is no detail as to these attempts. Dr. Patel's letter explains that "patient has acted impulsively in the past by engaging in various self-injurious behaviors (cutting) and mismanaging medications." This part of plaintiff's history is even more fully described in the hospital's discharge note (upon which the ALJ relied as showing plaintiff's improvement) which observed that plaintiff had "high risk behavior/self-injurious behavior" and "history of intentional overdose." Dr. Patel also observed that

"[p]atient's depression appears to have a strong biological/genetic component given strong family history and completed suicide of patient's father, however [it] is exacerbated by familial and relationship, which in turn is leading to financial hardships."

9. This strong treating physician evidence thus requires me to consider why the ALJ determined to give it "little weight." The ALJ reached this conclusion by finding that Dr. Patel's opinion statements noted

> marked or extreme limitations, when her own treatment notes do not corroborate such limitations. She portrays the claimant as so [sic] debilitated and limited in his everyday function, when her treatment notes consistently showed the claimant was doing well, worked part time as a chef, and was looking for work that would potentially be full time and have higher pay. While the claimant did require an inpatient hospitalization in September 2015, he significantly improved at discharge and there is no evidence that he decompensated to that level of depression.

This rationale mischaracterizes the treatment notes in many respects.

10. First, it is just as easy to see Dr. Patel's conclusions of "marked" limitations for simple tasks and "extreme" limitations for complex tasks as consistent instead of inconsistent with her notes. Dr. Patel's notes do not measure plaintiff's residual functional capacity. This is not surprising; a psychiatrist's weekly session notes usually have no reason to assess residual functional capacity. The ALJ's disagreement with the functional capacity conclusions that Dr. Patel reached simply means that Dr. Patel assessed him differently than the ALJ. But Dr. Patel's assessment is not inconsistent with her notes.

11. Second, it is not accurate to say that the notes "consistently showed the claimant was doing well . . . ." When these notes are reviewed in their entirety, there is no way to reasonably conclude that this plaintiff was "doing well." Over the course of some 50 therapy sessions, some are worse than others, as would be expected for such a long course of treatment

for major depressive disorder, but none are good. One has to hunt for any expression of happiness or satisfaction – there are a few, but they are narrowly focused and far between.

12. The ALJ may have seized on the fact that Dr. Patel would start the beginning of each note with a short quote from plaintiff at the session, such as "I'm ok"; "I'm alright"; "I'm a little better"; "my marriage is falling apart"; "a little bit more down"; "my life is over"; "I want to feel better"; "I'm fine." But if one drills down to the narrative following these quotations, which summarizes the bulk of plaintiff's self-reporting, there are few occasions when plaintiff displayed even mild happiness – the vast majority of the narratives describe thoughts that are fully consistent with severe depression. When the notes are read in their entirety, the conclusion that emerges is anything but "doing well."

13. Third, the ALJ's characterization of the record as showing that plaintiff worked as a part-time chef and in construction during the claimed period of disability is highly suspect. I think the ALJ fairly concluded that he did some kind of part time work – Dr. Patel's session notes do reflect that he did some work as a "private chef" (whatever that is – the ALJ did not inquire or explain it) during the period of disability – but nothing suggests anything approaching sustainable employment. To the contrary, the record contains plaintiff's forceful testimony that he did not do such work. He offered a possible explanation of any discrepancy, which was that he had been hoping to put in some hours at a friend's restaurant and had helped the friend set up the restaurant. He had also helped at the restaurant owned by his wife for a short time. But plaintiff was clear that even this assistance to his friend and his wife could not go beyond two hours a day, as he would then become distracted and unable to focus. Dr. Patel's opinion letter, in which she notes his inability to sustain part time work, together with plaintiff's testimony,

harmonizes her treatment notes with the other evidence, rather than showing a material contradiction between them.

14. Plaintiff was equally forceful in testifying that he very much wanted to work, and had applied for jobs with people he knew in the restaurant industry, but that doing so exacerbated his depression and that he could not maintain enough focus to actually perform reliably for any job. The ALJ seized upon his desire to work as an enhancing factor for RFC, but I do not see how that conclusion is warranted. As the ALJ noted, plaintiff had a solid work record despite his early-onset depression up to shortly before the time that he committed himself to a mental hospital. Dr. Patel's notes clearly reflect that plaintiff's frustration was increased by his inability to work, even though he wanted to work. His employment status could have therefore fed, rather than reflected the alleviation of, his depression.

15. Although accurate, the ALJ's observation that "while the claimant did require an inpatient hospitalization in September 2015, he significantly improved at discharge and there is no evidence that he decompensated to that level of depression," is removed from the context of Dr. Patel's notes and plaintiff's mental illness. It is hard to see how a suicidal psychiatric patient's discharge report could not be more favorable than his admission report, else he would not be discharged. Even with that, this discharge report still shows serious problems. He was discharged with current diagnoses of "major depressive disorder, recurrent" and "personality disorder NOS." His display of symptoms as compared with the time of his admission was "much improved . . . but some symptoms remain." His functional capacity was only "minimally improved."

16. And the discharge report also contained a fact that, strangely, the ALJ barely mentioned – plaintiff was discharged with the expectation that he would "continue with

outpatient phase ECT for treatment . . . ." He was having it three times a week while an inpatient, and twice a week once he was discharged. In other words, the degree of plaintiff's recovery at discharge was not sufficient to avoid him thereafter being strapped down at least twice a week and having electricity run through his brain. This he did, and although the record suggests that there may have been some alleviation of his depression as a result of the electro shock therapy, it is clear that he suffered side effects of memory and cognitive loss as the price for any relief.

17. Instead of recognizing the need for the highest level of outpatient psychiatric therapy that one could have, the ALJ peculiarly commented that plaintiff's "treatment has been essentially routine and/or conservative in nature." Short of a lobotomy, I am not sure what more can be done to treat psychiatric problems on an outpatient basis besides weekly sessions, enough psycho-pharmaceuticals to calm a horse, and electro-convulsive therapy. There certainly does not seem anything to me "routine" or "conservative" about the last of these.

18. I recognize that the ALJ did not did not discount Dr. Patel's opinions without having something in the record upon which to fall back. The ALJ relied upon the consulting examination by a psychologist and its approval based on a records-only review by a non-examining psychiatrist obtained during the initial review stage. Each of these could only support a finding of non-disability, as each reflected a far less severe restriction of functional capacity that the opinions of Dr. Patel.

19. However, these initial opinions are a very thin reed. It does not appear that the psychologist had any of Dr. Patel's treatment notes, let alone her opinions. Although the psychologist notes in passing that plaintiff was receiving ECT, there is no effort to ascertain

whether plaintiff had suffered memory and cognitive impairment as a result of those treatments (a question which may not have been within the expertise of a psychologist in any event).

20. More fundamentally, the limited probative value of one-shot consultative examinations is often noted in the case law. See Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013). That observation is of particular moment in dealing with a psychiatric impairment like major depressive disorder, which can vary in its manifestation from day to day. That means that the opinion of a psychiatrist with a solid longitudinal relationship with a patient, unless it is fundamentally flawed, is likely to have much more probative value than that of a single-examination consultant.

21. It is clear from the discussion above that the ALJ's decision does not convince me that there are fundamental flaws in Dr. Patel's opinions. To put it bluntly, Dr. Patel's opinions are so detailed and based on such a thorough set of treatment notes that for the ALJ to reject them, the ALJ would have to effectively hold that Dr. Patel was deliberately exaggerating her own views on plaintiff's impairments, or, at least, that she had opined with a level of competence below what one would expect of a board-certified psychiatrist. If that is the ALJ's view, it should be plainly stated, and then supported with a much more thorough analysis of the reasons for it than the current decision contains.

22. The other challenge obliquely raised by plaintiff is insubstantial, and I comment on it only because there will be a remand. Plaintiff's brief alleges that the ALJ improperly relied on a vocational expert's testimony because the testimony was inconsistent with the Dictionary of Occupational Titles ("DOT").

23. Plaintiff's point appears to be that according to the DOT, these jobs require the ability to be able to follow detailed instructions at a very high level, whereas the vocational

expert's testimony, consistent with the ALJ's hypothetical (and ultimate finding), was that plaintiff was limited to "occasional interactions with supervisors, coworkers, and the public."

24. The basis for plaintiff's point is hard to understand, and only the Commissioner's response to it has signaled to the Court what plaintiff is trying to convey. With no citation or even explanation, plaintiff is apparently referring to Appendix B of the DOT, which is entitled "Explanation of People, Data, and Things." There are numerical codes that are assigned to particular jobs. Each code is composed, at least in part, with particular areas of required performance (perhaps it would not be wrong to call them "domains") with the fourth, fifth and sixth digit of the Code corresponding to Data, People, or Thing criteria, respectively, in Appendix B.

25. The vocational expert testified that plaintiff could perform the jobs of garbage collector (code 955.687-022), salvage laborer (code 929.687-022), hand packer (code 920.587-018), or marker (code 209.587-034). Because each of these jobs has an "8" in the fifth position of its code, which corresponds to "Taking Instructions – Helping" under the People domain, plaintiff is apparently contending that the VE's testimony was inconsistent with the DOT because plaintiff is too severely impaired to take instructions or help.

26. If that is the argument, at least one of its fatal problems is that "Taking Instructions – Helping" does not require any particular degree of functionality. The "8" merely requires the VE to consider that function. To assess how much of that functionality is required, one must turn to SSR 00-4p. That requires the lowest or next to lowest level of ability for these kinds of unskilled jobs, referred to as SVP level 1 and 2. That is precisely what the VE testified. Plaintiff's argument has no merit.

27. Plaintiff's motion for summary judgment is granted and defendant's cross-motion for judgment on the pleadings is denied. The case is remanded to the Commissioner to conduct a further hearing and reconsider the application of the treating physician rule. It will be within the ALJ's discretion whether to obtain another consultative report from a psychiatrist, but if she does, then she should provide that psychiatrist with copies of Dr. Patel's opinions and treatment notes. The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
      May 2, 2018